UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 25-cv-24465-Bloom

DANIEL BOYLE,

Plaintiff,

-vs-

CARNIVAL CORPORATION,

Defendant.
_______________________________________/

Via Zoom Videoconference

Tuesday, November 10, 2026
10:08 A.M. to 1:01 P.M.

VIDEOTAPED DEPOSITION OF

NOELLE HENRY

AS CORPORATE REPRESENTATIVE OF CARNIVAL CORPORATION

Taken before Jennifer Cope, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition Duces Tecum filed in the above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:
DAVID W. SINGER & ASSOCIATES, P.A.
1011 South Federal Highway
Hollywood, Florida 33020
954-920-1571
mahoffman@1800askfree.com
BY: MICHAEL A. HOFFMAN, ESQ.

On Behalf of the Defendant:
JONES WALKER LLP
201 South Biscayne Boulevard
Suite 3000
Miami, Florida 33131
305-679-5700
lrose@joneswalker.com
BY: LAUREN S. ROSE, ESQ.

Also Present:
Mariana Lopez, Videographer

INDEX

TESTIMONY OF NOELLE HENRY


| | PAGE |
|---|---|
| Direct Examination by Mr. Hoffman | 6 |
| Cross-Examination by Ms. Rose | 87 |
| Certificate of Oath | 107 |
| Certificate of Reporter | 108 |


INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 9 |
| Exhibit 3 | Defendant's Answer and Affirmative Defense | 12 |
| Exhibit 4 | Defendant's Answers to Plaintiff's First Interrogatories | 29 |
| Exhibit 5 | Amended Answers to Plaintiff's Interrogatories | 19 |
| Exhibit 6 | Defendant's Responses and Objections to Plaintiff's First Request for Production | 25 |
| Exhibit 9 | Photograph of Handrail | 20 |
| Exhibit 11 | Dr. Boyle's Passenger Injury Statement | 60 |

INDEX OF EXHIBITS (CONT.)

PLAINTIFF'S EXHIBITS MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | Defendant's Supplemental Answers to Plaintiff's First Interrogatories | 33 |
| Exhibit 17 | CCTV Video | 53 |
| Exhibit 18 | Photograph of Stairs | 82 |

(Exhibits were retained by Mr. Hoffman.)

DEFENDANT'S EXHIBITS MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit D1 | Carnival Booking Details | 89 |
| Exhibit D3 | Screenshot of CCTV | 97 |

(Exhibits were retained by Ms. Rose.)

THEREUPON:

THE VIDEOGRAPHER: Good morning. We're on the record for the video deposition of Noelle Henry, taken in the matter of Boyle v. Carnival Corporation. Today is November 10th of 2026, and the time is 10:08 a.m. This deposition is being conducted remotely.

The court reporter is Jennifer Cope, and the videographer is Mariana Lopez.

Will counsel please introduce themselves? After which, the court reporter will swear in the witness. You may proceed.

MR. HOFFMAN: Good morning. Michael Hoffman on behalf of the plaintiff, Daniel Boyle.

MS. ROSE: And good morning. Lauren Rose of the law firm Jones Walker on behalf of the defendant, Carnival.

THE REPORTER: Okay, Ms. Henry. If I could have you raise your right hand for me, please?

MR. HOFFMAN: --

NOELLE HENRY,

having first been duly sworn, testified as follows:

THE REPORTER: You can put your hand down now.

Mr. Hoffman, you may proceed.

MR. HOFFMAN: All right. Thank you.

DIRECT EXAMINATION

BY MR. HOFFMAN:

Q. Good morning, Ms. Henry. How are you?

A. Good morning. Good. And yourself?

Q. Good. Thank you. So we've had a couple of corporate rep depos over the last couple months. Have you had any others?

A. I feel like I've had a -- maybe two others.

Q. Okay. All right. So for today, you've been designated as Carnival's corporate rep for this deposition?

A. Yes.

Q. All right. And have you had a chance to review the Schedule A on the corporate rep depo notice?

A. Yes.

Q. Okay. So -- and are there any matters that are listed in Part A, that you are not prepared on today?

A. Not to my knowledge.

Q. Okay. And the notice requires you to testify to information known or reasonably available to Carnival, not just your personal memory, correct?

A. Correct.

Q. So have you had the opportunity to review the

Schedule A to make sure that you've obtained information that's reasonably available to you?

A. I think I've been properly prepped for the materials provided, yes.

Q. Okay. Could you tell me your title and your department?

A. I am Carnival's corporate rep, as -- and as well as a claims adjuster for guest claims.

Q. And how long have you been in your position as a claims adjuster?

A. Two years and 11 months now.

Q. Okay. And how long have you been serving as the corporate rep?

A. I would say since maybe September.

Q. Were you selected to be the corporate rep for this matter?

A. Yes, I was.

MS. ROSE: Form.

THE WITNESS: Oh.

MS. ROSE: It's --

BY MR. HOFFMAN:

Q. Were you the claims adjuster for this matter?

A. No.

Q. Have you been aboard the -- this took place on the Carnival Panorama, correct?

A. Yes.
Q. Have you been aboard the Panorama?
A. No.
Q. Okay. Have you been aboard any of the sister ships?
A. Not on the Vista class, no.
Q. Could you tell me who you spoke to to prepare for today?
MS. ROSE: Form.
THE WITNESS: Just -- just Lauren.
BY MR. HOFFMAN:
Q. Okay. And could you tell me how long you spoke for?
A. How long our prep was?
Q. Sure.
A. Yesterday, we did about an hour and a half.
Q. Okay. And did you have an opportunity to review documents?
A. Yes, we did.
Q. Okay. Could you tell me what documents you reviewed?
A. Everything that was produced to you and everything that was produced to us.
Q. Got it. Did you review the handrail retrofit file?

A. I don't remember particularly seeing that.
Q. Okay. So do you know if they were produced?
A. I know we went through all the documents that Lauren prepared for me to see, but I can't recall off the top of my head. If you showed it to me, I'd probably be able to tell you if I saw it.
Q. Okay. I'm going to share with you --
MR. HOFFMAN: I'll have this marked as Exhibit 1.
(Exhibit 1 was marked for identification.)
BY MR. HOFFMAN:
Q. This is the Notice of Videotaped 30(b)(6) Deposition. Hold on. Okay. So this is -- are you able to see the screen okay?
A. Yes.
Q. So this is a ten-page document, and it's Plaintiff's Notice of Videotaped 30(b)(6) Deposition. So this is -- you've seen this document before?
A. Yes, I have.
Q. And on the bottom here, it has a list of documents to produce -- documents to be produced. And number 4 says, "All documents concerning the handrail retrofit on the vessel, and on each sister vessel, including the proposal, the approval, the drawings, and specifications, the work order, the installer's

documentation, the invoices, before-and-after photographs, and the communications in which the decision was made or explained."

Do you know if those documents were produced?

A. Not to my knowledge.

Q. Okay. Are you able to speak about those issues today?

A. Briefly, I can. To what I know, yes.

Q. Okay. And that's based on your review of documents or --

A. Based on my prep for today.

Q. Okay. Did you speak with Monica, and I apologize if I mispronounced her name, Borsegui (phonetic)?

A. Borsegui. Not -- not particularly. She was also being prepped for something yesterday when I was being prepped.

Q. Okay. Monica is a claims adjuster?

A. No. She's our manager.

Q. Understood.

A. She oversees all of us.

Q. Understood. Did you have an opportunity to speak with Samir Thapa (phonetic)?

A. I did not. Not myself, no.

Q. Okay. When you say, "not myself," do you know

anyone that would have?
A. I'm not sure if he was deposed by Lauren or Counsel, but I did not speak with him, no.
Q. Did you speak with anyone in technical operations or refit?
A. No, I did not.
Q. Okay. So when I said, did you speak with Monica, you had said that she was in a depo -- I guess she was doing something else, but at any point in time, have you learned anything from Monica about this case?
A. No, I have not.
Q. Okay. And do you speak with anyone in -- regarding the architecture design for the Panorama?
A. No.
Q. Okay. I want to talk to you about Carnival's role in design, and I wanted to ask, so Carnival -- does Carnival participate in some aspects of the design of the ships?
A. The design of the ships is definitely down to the ship maker, the shipbuilder. I'm sure we have, like, a small role in the final say of yes or no, whether we want specific things in there. But as far as, like, the structure of the ship, that aspect is up to the shipbuilder.
Q. Okay.

MR. HOFFMAN: The reason I ask is, I -- I want to show what I'll have marked as Exhibit 3, which is Defender's (sic) Answer and Affirmative Defense.

(Exhibit 3 was marked for identification.)

MR. HOFFMAN: Oh. I thought I was sharing -- was I sharing that? Did it switch to Exhibit 3 when I went over?

MS. ROSE: No --

MR. HOFFMAN: -- so yeah, I think it pauses.

BY MR. HOFFMAN:

Q. So had you had an opportunity to review the pleadings in the file regarding this case?

A. Yes, I did.

Q. Okay. So --

MS. ROSE: Michael, I'm -- I'm sorry to interrupt. Just before you continue, there's been some highlighting on the two exhibits you've shown.

MR. HOFFMAN: Yeah.

MS. ROSE: Can you clarify whether that was added by yourself?

MR. HOFFMAN: Oh, yeah. Sorry. All highlighting to all documents, I believe, have been added, so I'll definitely mark that, make sure that that's clear for the exhibits.

MS. ROSE: Thank you.

MR. HOFFMAN: You're welcome.
BY MR. HOFFMAN:
Q. So here on -- so are you able to see the screen okay?
A. Yes.
Q. Okay. So it says in Count III, "Negligent design and/or approval design," it says, "Carnival participates in some aspects of the design of its ship -- of its ships."
Could you identify what aspect of the design Carnival participates in specifically?
A. Yes. I would say that we participate in, say, after the ship is built by the shipbuilder, if there's things we want changed or something that we don't particularly like about a design in a specific area, then that is when we would probably get involved, like, as a liaison, but we are not sitting there side by side the shipbuilder and watching them or spectating and making sure things are exactly how we want it. We kind of go over before we put into service.
Q. Understood. Are handrails and guards in passenger public spaces one of those aspects where Carnival participates?
A. I would say likely during a dry dock or after build, but -- or if we want to add something, most

likely, yes.

Q. Okay. Is there a Carnival employee or consultant who would have reviewed the atrium staircase upon receipt of the ship?

MS. ROSE: Form.

THE WITNESS: It would -- it would usually be the, I think, safety manager. The -- I'm not sure exactly who it was in this case, but yeah, the safety manager would usually go through and make sure everything is up to code and safe.

BY MR. HOFFMAN:

Q. Okay. And is the safety manager a corporate employee?

A. Might be shoreside. It might be shipboard. I'm not too certain on that.

Q. Okay. Does each ship have a safety manager?

A. I'm not sure if it's each ship or if there's one safety manager for all ships.

Q. Okay. Thank you. Do you know the Carnival design standard for handrails and guards at passenger stairways that were in effect during the design of this boat?

A. The code?

Q. Yes.

A. No. But I know we were in compliance with the

code.

Q. What code are you referencing?

A. I don't know the numbers off the top of my head. But I know that we were in compliance, because the shipbuilder does build in compliance to cruise line standards and the code that we like to uphold.

Q. I -- I -- I have here, does "ASTM F1637" or "ASTM F1166" be one of those references -- those standards that you were referencing?

A. Yes. Both of those do ring a bell.

Q. Okay. And what do you know of those standards?

MS. ROSE: Form.

THE WITNESS: I don't know much. Just based on what I was prepped on, we are up to code with those standards.

BY MR. HOFFMAN:

Q. Do you know if they address short flights of one or two risers?

MS. ROSE: Form.

THE WITNESS: Not to my knowledge. I don't think I was prepped on that, no. That's an expert question.

BY MR. HOFFMAN:

Q. Okay. So in the same vein, I'm going to --

going to ask if the -- do you know if the standard references or addresses elevation changes next to bars or counters specifically?

MS. ROSE: Form.

THE WITNESS: No. No, I'm not aware of that.

BY MR. HOFFMAN:

Q. Okay. Are you familiar with SOLAS, S-O-L-A-S?

A. Not that I can remember. I remember seeing it briefly for another case, but not for this one.

Q. Okay. Would you know if it was applied in the designing or inspecting or modifying of the passenger stairways on the Panorama?

A. If it is a safety code, then yes, most likely it was.

Q. Okay. Under Carnival's standards, was a two-riser flight with no handrail on one side permitted in a passenger public space?

MS. ROSE: Form.

THE WITNESS: You'd have to repeat the question. I'm sorry, Michael.

BY MR. HOFFMAN:

Q. Okay. Under Carnival's own standards, was a two-riser flight with no handrail on one side permitted in a passenger public space?

MS. ROSE: Same objection.

THE WITNESS: I'm still not understanding the question. I'm sorry.

BY MR. HOFFMAN:

Q. Yeah. No, it's okay. So we're talking about a two-riser flight, two -- two-step elevation here. And the question is, under Carnival's own standards, is it acceptable for there just to be a handrail on one side and not on the other in a public space?

MS. ROSE: Form.

THE WITNESS: I believe -- I believe that in this instance, I'm sure you're referring to this incident that happened, there was one handrailing at the time, but it was accessible. The guest could have chosen to use that handrailing, and he did not, so I'm not sure how else to answer that question.

BY MR. HOFFMAN:

Q. Okay. But does Carnival have a -- a standard as to whether or not a two-riser flight should have a handrail on each side?

MS. ROSE: Form.

THE WITNESS: Not to my knowledge. I'm not sure what the code is on that.

BY MR. HOFFMAN:

Q. Okay. Thank you. Does Carnival have any

document in which anyone considered whether these two steps needed a barside handrail?

MS. ROSE: Form.

THE WITNESS: No, not to my knowledge, or not that I was prepped for.

BY MR. HOFFMAN:

Q. Okay. So you don't know if the question was never asked if you weren't --

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. --

A. No, I'm not aware.

Q. Okay.

MR. HOFFMAN: I need two minutes, so if we could go off record and -- actually, give me five minutes. I just want to get my documents ready for the next section. Not -- they're not ready, so if I may. Okay.

THE VIDEOGRAPHER: We are going off the record. The time is 10:25 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:34 a.m.

BY MR. HOFFMAN:

Q. Thank you for your patience. In the Amended

Answers to Plaintiff's Interrogatories, which was -- I'll share with you on my screen, which is highlighted. And are you able to see the document okay?

A. Yes.

MR. HOFFMAN: So can I have this marked as Exhibit 5?

(Exhibit 5 was marked for identification.)

BY MR. HOFFMAN:

Q. It states here, "In or around" -- in response to the question, "Please identify all modifications, e.g. application of contrasting nosing, strips, watch-your-step signage, textured tape, made to the subject area from the date the ship launched to the present, and specifically state when the current stair nosing was installed and if it was present on the date of the fall."

"Carnival is diligently looking for information responsive to the remainder of the interrogatory and will supplement its response if/when such information is obtained." And then in the supplemental response, it says, "In or around November 2025, the Panorama, Horizon, Vista, Firenze, and Venezia had an additional handrail added to the atrium stairs on the respective ships. The date of installation for the Panorama was November 16th, 2025."

And the -- have I read that correctly, that that's Carnival's sworn answer?
A. Yes.
Q. Okay. And where on the Panorama was it installed relative to the bar, the landing, and the two steps?
MS. ROSE: Form.
THE WITNESS: From my knowledge, on the other side of the original handrailing.
BY MR. HOFFMAN:
Q. Okay. Does it run along the bar side of the two steps?
A. I'm not sure if they installed it -- if they moved things around at the bar, because I know there were some bar stools in that area where they --
Q. Okay.
A. -- would've placed the handrail. But I know it's been placed across from the other handrail.
Q. Okay.
MR. HOFFMAN: I'm going to share with you what I have marked as Exhibit 9.
(Exhibit 9 was marked for identification.)
BY MR. HOFFMAN:
Q. So is this the handrail that we're just speaking of on -- in the middle of the image?

A. Yes.
Q. Okay.
A. It seems to be.
Q. I'm sorry?
A. Sorry. I said, it seems to be. Sorry.
Q. Thank you. And does it occupy a position where no handrail existed on October 12, 2024?
MS. ROSE: Form.
THE WITNESS: If this is the subject ship, there was a handrail on the other side, so --
BY MR. HOFFMAN:
Q. All right. Yes, but we're talking about the newly installed handrail that's along the bar, correct?
A. Correct.
Q. And is it correct to say that it now occupies a position where no handrail existed on October 12, 2024?
A. Correct.
Q. Do you know when the installation of this handrail was first proposed?
A. The idea was in the summer of 2024, so even prior to the incident. Mr. Boyle's incident.
Q. Okay. What was the reason?
A. There's no real reason. Carnival is just always looking for new ways or additions to be made

throughout, so they decided to go ahead and put in an additional handrail.

Q. Do you know who was the first person to propose a handrail installated -- installed there?

A. If I'm not mistaken, it was Mr. Suhe (phonetic) --

Q. Okay.

A. -- who works with the safety department.

Q. Okay. Do you know his role, his title?

A. He is a senior manager of that department.

Q. Okay. Do you know if it's his role to do that on all ships?

A. I'm not sure. I think he's just the senior manager of the entire department. I'm not sure if it's just for the Panorama or the Vista class.

Q. Okay. Is he shoreside?

A. I'm not sure. That, I'm not sure of.

Q. If he wasn't shoreside, where would he be located?

A. Possibly on board ships.

Q. Okay. So it's not a full-time job? Is it a contract position?

MS. ROSE: Form.

THE WITNESS: I am not sure of that.

BY MR. HOFFMAN:

Q. Do you know if -- did you have an opportunity to review any drawings or specifications or work order related to the installation of the handrail along the bar?
A. No, I did not.
Q. Do you know what the Panorama rail cost?
A. No, I do not.
Q. Do you know who directed the same rail on the Horizon, Vista, Firenze, and Venezia?
MS. ROSE: Form.
THE WITNESS: I'm only aware of the handrail on the Panorama, who directed that, which is Suhe.
BY MR. HOFFMAN:
Q. Did Carnival design the November 2025 handrail?
A. To my knowledge, it was the shipbuilder. I'm not sure if we -- I'm sure we played a role in the final decision or say of yes or no, but it was the shipbuilder.
Q. It was Fincanteria -- Fincantiera? I'm sorry. Mispronouncing it.
A. Fincantieri. No, you're fine.
Q. Okay. It was Fincantieri that was the one who designed the handrail?
A. Yes.

Q. Okay. Have you reviewed the prior incidences that were -- that occurred prior to Mr. -- Dr. Boyle's fall that occurred at the two-step rising?

A. I am knowledgeable on prior instances, but I'm trying to see what you're referring to.

Q. Do you know how many incidences occurred before Dr. Boyle's fall?

MS. ROSE: Form.

THE WITNESS: Like, in the Vista class?

BY MR. HOFFMAN:

Q. Yes, within the Vista class at these steps.

A. Yes.

Q. How many were -- occurred before Dr. Boyle's fall?

MS. ROSE: Form. Is there a time frame, Michael?

MR. HOFFMAN: Sorry.

BY MR. HOFFMAN:

Q. In the three years, I guess, that was produced?

A. That --

MS. ROSE: Form.

THE WITNESS: -- would be nine.

BY MR. HOFFMAN:

Q. I'm sorry. Two years. In the two years that

were produced?

A. I reviewed nine, or I saw nine, but I'm not sure if that was within the two-year frame.

Q. Okay. And do you know how many occurred between the time that Carnival approved the balcony -- or, the handrail, and Dr. Boyle's fall?

MS. ROSE: Form.

THE WITNESS: No. I'm not knowledgeable on the specific timeline, no.

MR. HOFFMAN: Okay. I want to share with you -- have marked as Exhibit 6, which is Defendant's Objections -- Responses and Objections to Plaintiff's First Request for Production.

(Exhibit 6 was marked for identification.)

BY MR. HOFFMAN:

Q. And there's highlighting on here that was placed by the plaintiff. I want to go to RFP 14 that states, "Records showing repairs and alterations made to the floor and/or steps in the area where the plaintiff fell within about a 20-foot -- within about a 25-foot radius from the 12 months preceding the accident and three months following the accident." And it says, "There were no repairs or alterations made to the subject area from October 12th, 2023 through present, therefore none."

Am I reading that correctly?

A. Yes.

Q. So this was answered, I believe, on April 6, 2026. And at that point, the rail had already been installed on the Panorama for over 120 days, correct?

MS. ROSE: Form.

THE WITNESS: Correct.

BY MR. HOFFMAN:

Q. Okay. And would it be safe to say that the retrofit was within 25 feet of where Dr. Boyle fell?

MS. ROSE: Form.

THE WITNESS: I can't be certain of the amount of feet, but it's near where he fell, yes.

BY MR. HOFFMAN:

Q. Would you say it's within 25 feet?

MS. ROSE: Form.

THE WITNESS: I can't say. I don't have a tape measure or -- I'm not in the area --

BY MR. HOFFMAN:

Q. Do you know how wide the steps were in that area?

A. No, I do not.

Q. Okay. Okay. Based on that answer, does Carnival not consider a new handrail an alteration to the subject area?

MS. ROSE: Form.

THE WITNESS: In what context? I'm not really understanding your question.

BY MR. HOFFMAN:

Q. Yeah. So the question asked about any repairs or alterations, and the question is -- is whether a new handrail would qualify as an alteration under Carnival's -- you know --

A. I would say it's an addition. I wouldn't say it's a repair and alteration, because we didn't fix something. We added something.

Q. Okay. Do you know why it was deemed that needed to be added?

MS. ROSE: Form.

THE WITNESS: To my knowledge, we just -- Carnival likes to make sure, if there's anything that we feel needs to be added, that could be of aid to the guests, or that could make the experience better, we do so throughout all of our ships. We're continuously looking for different things to add on or remove as time goes on.

BY MR. HOFFMAN:

Q. And when you say, "better," you mean -- do you all -- would that include being safer?

MS. ROSE: Form.

THE WITNESS: Not always. We -- also for aesthetic purposes. It just depends on the area or the situation, or why they're looking to change or add things.

BY MR. HOFFMAN:

Q. Okay. But -- so I guess safety may not be the only reason, but safety is a reason why something would be added, correct?

A. Yeah. We obviously want our guests to have a good time and be safe throughout the entirety of their cruise.

Q. Okay. Is there any sort of measurement of quantity of incidents that trigger that sort of safety inspection?

MS. ROSE: Form.

THE WITNESS: No. Not at all. There's no amount of incidents or safety concerns that would trigger that.

BY MR. HOFFMAN:

Q. Does the severity of an injury, is -- is that a possible trigger for whether a safety inspection or review is done?

A. No.

MR. HOFFMAN: Okay. On -- I'm going to go back to Exhibit 4, which is Defendant's Answers to

Plaintiff's First Interrogatories.

(Exhibit 4 was marked for identification.)

BY MR. HOFFMAN:

Q. Actually, I think it's the first time I'm referencing it. And I'm going to go to interrogatory 5, and it states, "Please identify every incident within two years preceding October 12th, 2024, in which a passenger or crew member fell, tripped, stumbled, or repeated -- reported a near miss at the subject area or at structurally identical locations on Vista class sister vessels. For each incident, state the date, time, and Cvent number, the specific mechanism of injury, e.g. missteps, optical illusion, and whether, and see whether the lack of handrails or visual cues was noted."

And then the response says, "Carnival objected -- objects to this request interrogatory as vague, overly broad, unduly burdensome, not sufficiently limited in time or scope, and not proportional to the needs of this case." And then in its -- I'm going to go to Exhibit 3 now, which is the Answer and Affirmative Defenses, which -- which states at the affirmative defenses that, "Carnival asserts" -- the seventh affirmative defense, "Carnival asserts it had no notice, actual, constructive, or otherwise of any alleged

dangerous condition, which the plaintiff alleges was a proximate cause of his damages. And as such, Carnival is not liable to the plaintiff based on the theory of negligence and Plaintiff is unable to recover from this defendant."

Both are Carnival's positions, correct?

A. Correct.

Q. So if Carnival had no notice of any danger at these steps, could you state the reason it installed a handrail there on November 16th, 2025?

MS. ROSE: Form.

THE WITNESS: It could have been for aesthetics as well. I mean, there's -- one side has a handrail. Coming down the stairs, there's two sets of handrails. It just looks, like, a little off. I mean, it could have been for aesthetics. I don't really think it had anything to do with the subject incident, considering that it was already in talks prior to the incident.

BY MR. HOFFMAN:

Q. Well, there had been other incidences prior to the talks to install that handrail, correct?

A. But remember, the other instances don't necessarily have an effect on whether or not we installed the handrail because there is one handrail

readily available to guests.

Q. Okay. In -- before pleading no notice, do you know what Carnival did to learn whether anyone had fallen at these steps or the same location on a sister ship?

MS. ROSE: Form.

THE WITNESS: You have to remember too that we're not going to be -- we're not going to have knowledge of every trip, slip, fall, because unless it goes past first aid, you know, it's not investigated, or unless the guest comes themselves and tells guest services, hey, like, I fell or this is what happened to me. We're not going to have knowledge of every single thing that happens on the ship.

BY MR. HOFFMAN:

Q. So when things like that happen, what database do they go into?

A. I'm not understanding. What do you mean what database?

Q. Yeah. So does -- when it completes a search for learning whether or not anyone had fallen at these steps or the same location, what databases does Carnival use to record guest injuries as it relates to incidents and locations?

A. I mean, we could use Cvent, which is where we get our security reports from, but that's pretty much the only thing I could think of that we -- we would use.

Q. Okay. Would Cvent also include any injuries or complaints that employees suffered?

A. I'm not sure how that applies here.

Q. Well, I'm talking about notice and what databases that Carnival uses to determine whether it had received notice of an alleged dangerous condition. So if employees are -- injuries and incidences are maintained in a different database, it was asking if that existed separate from Cvent. And if so, is that part of the search to determine that Carnival had no notice?

A. You have to remember, it's guest claims. So anything to do with crew or employees, I wouldn't have much knowledge on.

Q. Okay. So based on the answer regarding notice, Carnival would not consider employee falls or injuries at a specific area as counting towards notice of a dangerous condition?

MS. ROSE: Form.

THE WITNESS: I'm not sure why you're asking about it. It -- it doesn't really apply here. We're talking about a guest injury. How crew

injuries and that is contributory to dangerous conditions, that has nothing to do with my position, and I don't know whether or not that applies.

BY MR. HOFFMAN:

Q. Okay. The reason I'm asking is it's not specific to the -- the classification of the human being. It's just whether a human being has run into an alleged dangerous condition and that -- whether that would qualify as notice to the corporation. And what I'm understanding is that there's a separation between guests and employees, or that you're not aware as to whether or not there is?

A. Yes. I'm not aware as to where -- whether crew members' incidents would contribute to dangerous condition notice.

Q. Okay. Thank you.

MR. HOFFMAN: I'd like to show what I have marked as Exhibit 16.

(Exhibit 16 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is Defendant's Supplemental Answers to Plaintiff's First Interrogatories. And this was served on -- it was verified by November -- on November 2nd by Monica Borsegui and served November 4th. Is this

-- this is -- have you seen this document?
A. It looks similar to the others. You would have to scroll a little bit.
Q. I see. So --
A. Yeah, I see that.
Q. Okay. So thank you. So again, the highlighting on here is Plaintiff's -- so I'm going to Page 3, which states that Carnival searched for all incidences, and where it says response, "Pursuant to the magistrate judge's discovery order, ECF number 39, Carnival searched for all incidents in the subject area defined by Plaintiff as a transition area between the lower level of the Panorama atrium deck 3 and the walkway near the Panorama Bar Horizon Restaurant entrance on MS Carnival Panorama, specifically the two-step drop-off where Plaintiff fell on our Vista ship class -- Vista class ships, Vista Horizon Panorama."
And my question is -- is: Are those all the Vista class ships?
A. Yes.
Q. Is Firenze a Vista class ship?
A. No.
Q. Is Venezia a Vista class ship?
A. No.
Q. Or sorry. Okay.

A. I know what you meant. No.

Q. So these incidences, they run from January 17th, 2023, to October 5th, 2024. And these all occurred before March 3rd, 2026, correct?

A. Correct.

Q. And these were all recorded in Carnival's own system?

A. I'm assuming so, they were recorded if we have knowledge of them, yes.

Q. Okay. So in -- in the descriptions here on the first one, it says, "Guest claimed that she was descending the spiral stairs from deck 4 to 3 to the -- deck 4 to deck 3 to the atrium lobby when she tripped over on the second steps from a landing area on deck 3 and fell forward and landed on her knees and hands to the carpeted floor."

Would you say that's a similar incident to what occurred with Dr. Boyle?

MS. ROSE: Form.

THE WITNESS: No. I think all of these instances, it's -- they're individual. It's up to the individual how these incidents happened. There's also contributing factors that we don't have on here. This is not the full gist of it, so I can't say it's similar.

BY MR. HOFFMAN:

Q. Okay. So January 29, "Guest claimed that she was -- while she was descending the stairs near the lobby bar, deck 3, forward lobby, starboard side near Reflection Restaurant, she missed the two steps, fell forward and landed on her back and the tiled floor causing her injury."

Again, is this not a similar prior incident?

MS. ROSE: Form.

THE WITNESS: Again, it's up to the individual. We obviously don't know the contributing factors, so it's hard for us to -- for me to say yes, a 100 percent, it's very similar. I don't know the basis of what happened during these incidents.

BY MR. HOFFMAN:

Q. And -- and wouldn't that be safe to say for the remainder of the incidences so I don't have to go through each one?

A. Yeah, you don't. I would say the same for all of them.

Q. All right. Thank you. Do you know if any lawsuits were filed as a result of any of these injuries?

A. Not to my knowledge, because this is not my

ship. I wouldn't be too privy on -- or my class. I wouldn't be too privy on any of these instances.

Q. What is your regular class that you're assigned to?

A. The ships that I handle are Elation, Glory, Sunrise, and Radiance.

Q. And are those of a specific class?

A. They are, but I think they're different classes. I'm not even too sure which class all of them fall under.

Q. Would they be the entirety of the class or would you handle, like, some of the ships in a class and some of the ships in another class?

A. Some of the ships in a class and some in another. Yeah.

Q. But not all the ships in one class per se?

A. Correct.

Q. Okay. Thank you. So the descriptions, though, that are written, these are by Carnival -- Carnival personnel in the ordinary course after an incident, correct?

A. It could be an excerpt from our personnel. It looks like it is, but I can't be certain on where specifically, like, what system it came from.

Q. Well, it -- would there be a Cvent number for

these incidences?

A. We are in 2026. It -- they might still be present. Yeah. They might still be -- if they're still -- yeah, they -- they should be, some of them.

Q. Okay. How far back does the system maintain the record?

A. If I'm not mistaken, five years, but it could be three.

Q. Okay. Did all these guests go to the medical center?

A. That I cannot tell you. I do not know.

Q. If -- well, would it be fair to say that these incidences were investigated by Carnival, correct?

A. Yes.

Q. And is it correct to say that incidences are not -- are only investigated once a person goes to the infirmary and receives more than first aid, correct?

A. Yes. And also if they go themselves and report, then we would document just like this as well, if they go to us in guest care and report the incident, because this is only a small excerpt. This is not an investigation report. This is nothing substandard to tell you yes or no.

Q. Okay. So it is not -- I just want to be clear. It is not necessary to go to the infirmary and

receive more than first aid for an incident to be reported?

MS. ROSE: Form.

THE WITNESS: I think the way you're asking, I -- for the incident to be reported, it -- it can be reported by anybody. We're not going to deny guests coming to the guest services desk and asking or telling us that they had an incident.

BY MR. HOFFMAN:

Q. You're right. That was a very specific question. You're right. I guess, my follow-up question would be, once a report was made to guest services and not necessarily to the medical ship doctor, could an investigation still be opened regarding the incident that was reported?

A. My answer would be that an excerpt like this would be written, as usually is, just based off what the guest -- the guest's recollection of the incident. But based off these little excerpts, I can't really say whether or not, one, the guests went to the medical center because guests declined medical attention all the time, and two, if they continued to seek care or what occurred after they reported it.

Q. Okay.

A. I have no clue.

Q. Okay. So just to be clear, if one of these individuals -- so just because we have this report of prior incidences, it does not mean an investigation took place?

A. It could have for some of them. It could have not. I -- I can't be certain, no.

Q. Okay. Could an investigation be triggered if someone goes and makes the report, but does not go to the infirmary?

MS. ROSE: Form.

THE WITNESS: They would make excerpts like this, just letting a small excerpt of what happened and what was reported to them. But again, I'm not even sure who this was reported to or what happened, what was the outcome of these instances.

BY MR. HOFFMAN:

Q. Understood. Okay. Do you know if -- since the handrail has been installed, if incidences similar to these have continued to be reported?

MS. ROSE: Form.

THE WITNESS: No, I do not. I'm not aware. I was -- I only know the incidents that I was prepped for and what happened to Mr. Boyle. That's about it.

BY MR. HOFFMAN:

Q. On the -- I'm going to go back one more to -- it's one person. Her name is Paula Jane Hansen, and she -- guest -- it states here on -- on the Panorama, January 27th (sic), 2024, "While -- guest claimed that while she was walking around the lobby atrium bar counter on deck 3 by the spiral stairs landing area starboard side, she apparently missed her step on the carpeted steps and fell forward onto the tiled floor, thus causing an injury onto her right hip."

Is the Panorama bar on the starboard side of the deck 3 atrium?

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. I -- I guess, a quick -- asking, is this -- are -- are we referring to the same two-step drop where Dr. Boyle fell?

A. It could be very much, but I'm not too certain, no. I can't -- I can't confirm that.

Q. Okay.

A. Can we take five minutes?

Q. Yes, absolutely. Yes.

A. Once you are done with your line of questioning. Sorry.

MR. HOFFMAN: No -- no, that's -- you -- you're -- I hadn't gotten it out. So let's come

back at 11:15.

THE WITNESS: Okay. Perfect.

THE VIDEOGRAPHER: Thank you.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: We are going off the record. The time is 11:08 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:19 a.m.

BY MR. HOFFMAN:

Q. We were last talking about break -- before the break -- that little break, Ms. Hansen on the Panorama and her fall that occurred where it appears that she hurt her hip. Do you know if Carnival -- what did -- do you know if Carnival did anything at those steps between January 7th and October 12th, 2024?

MS. ROSE: Form.

THE WITNESS: No, not to my knowledge.

BY MR. HOFFMAN:

Q. Okay. And then on the Horizon on January 9th (sic), 2023 -- I can share the document with you if you need me to.

A. Yes, please.

Q. Absolutely. Thank you. I was looking at the -- the Horizon, January 29th, 2023, where it says, the

guest fractured her left hip. And that was a hip fracture. It says while walking, descending the stairs near the lobby. It says she missed the two steps. And it keeps on saying the two steps in the -- throughout these incidences. Are these the same two steps that we're talking about with Dr. Boyle, whether it be on a sister ship or on the Panorama?

A. I can't specifically say. It could have been the two steps at the longer set of stairs that she missed. I can't be -- I don't know the specifics on this one.

Q. Got it. And then looks like on the -- oh, so I guess the question there was, so this was on the Horizon. Is there any mechanism where Carnival will have, like, a fleet communication or a sister ship notification regarding issues or incidences that occur?

MS. ROSE: Form.

THE WITNESS: No. I think it's just per your request. They just delivered what was asked, but not to my knowledge, no.

BY MR. HOFFMAN:

Q. So it sounds like the -- because of this request, this inquiry was made, but I just want to be clear. There -- is there a mechanism that alerts a sister ship if there's a repeat location injury?

A. Not to my knowledge, no. Not that I'm aware of. There could be, but not that I'm aware of.

Q. So then it looks like for a call, it says, "After descending -- guest claimed that after descending the spiral atrium staircase from deck 4 to 3 close to the Reflection dining room while walking on the landing area, she apparently missed one of the two steps." So this -- these two steps are the steps that Dr. Boyle fell on, even though it's on the Horizon, correct? That's the same reference?

A. Different ship, but seems like she missed two steps. I, again, can't be certain. I'm not specific on these incidents.

Q. Okay.

A. Yeah.

Q. Right. Well, the other one, you -- it was a good point. You didn't -- it did not specifically state regarding the walking on the landing area, but I think that these others on -- if you look at Phillips, it also says, "Guest claimed that after descending the spiral atrium staircase from 4 to 3, while walking on the landing area, she missed -- apparently missed the last of the two steps and fell forward and struck her right big toe to the edge bottom of the side railings."

And then it looks like there's a couple more

that indicate the same landing issue. Sorry. Burke does not. Okay. They all say "missed the last two steps," but they don't say specific about the landing. And we don't know if --

MR. HOFFMAN: Okay. Thank you.

MS. ROSE: Of course.

BY MR. HOFFMAN:

Q. Would Carnival argue that these incidences that were provided were -- sorry. Scratch that.

Does Carnival contend any of the nine incidences was not substantially similar to Dr. Boyle's?

MS. ROSE: Form.

THE WITNESS: Again, individuals -- we don't know what particular differences there are with these individuals. I don't know what their medical history is. I don't know if they were under the influence. I -- there's different factors that play into all of them that I am not readily aware or ready to talk about because I don't know these other instances like I know Mr. Boyle's case.

BY MR. HOFFMAN:

Q. Got you. Okay. But it does say that the response, it -- "Carnival searched for all incidences in the subject area defined by Plaintiff as a transition area between the lower level of the Panorama atrium deck

3 and the walkway near the Panorama Bar Horizon Restaurant entrance on the MS Carnival Panorama, specifically the two-step drop-off where Plaintiff fell on all Vista ships." So with that in mind, and that's the basis of the response to these incidences, would it be safe to say that all of these incidences relate to the two-step drop-off where Plaintiff fell?

A. Yes. I would assume based off what was produced, yes, and our response.

Q. Okay. Thank you. Could Carnival have installed a handrail earlier than November 2025?

MS. ROSE: Form.

THE WITNESS: Are you asking if they did or if it was possible?

BY MR. HOFFMAN:

Q. It was possible.

MS. ROSE: Form.

THE WITNESS: I'm not sure how long or what the process is for them to decide or -- I mean, it's been in the works for a while, so --

BY MR. HOFFMAN:

Q. Okay.

A. I'm not sure why they chose to install it at that time and not before.

Q. Okay. So it looks like the -- the incidents

listed, the ninth one was on October 5th, 2024. And that was just seven days before Dr. Boyle stepped off the same drop, right?

MS. ROSE: Form.

THE WITNESS: What was the date?

BY MR. HOFFMAN:

Q. October 5th, 2024.

A. Okay. That was days prior, yes.

Q. Okay. And between January 17, 2023, the -- the first incident that was listed, and November 16, 2025, the date of the production -- no. Hold on. Sorry.

So between January 17, 2023, and October 12th, 2024, could you identify all actions that Carnival took at the atrium two-step drop on any Vista-class ship in response to a passenger fall?

A. What do you mean "all actions"?

Q. Were any railings placed on any of the other Vista-class ships after these other incidences, but prior to Dr. Boyle's?

MS. ROSE: Form.

THE WITNESS: Remember, we didn't input the railing because of any of these instances. It has nothing to do with -- there was nothing triggered that made us want to put in the handrail other than

the fact that the safety team just decided to put it in. There's nothing that triggers that.

BY MR. HOFFMAN:

Q. Do injuries at a location trigger a safety team review?

MS. ROSE: Form.

THE WITNESS: No. No. And there's no specific amount of instances that trigger that either.

BY MR. HOFFMAN:

Q. How many people are on a safety team per ship?

A. That I do not know.

Q. Do you know the cost of the handrail that was installed on the Panorama?

A. No.

Q. Do you know if a ship was required to be taken out of service for the installation to take place?

A. No, not that I'm aware of.

Q. Do you know how many hours installation took?

MS. ROSE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Would that be indicated in a work order as to how long a job took?

MS. ROSE: Form.

THE WITNESS: Work orders are when things need to be fixed, so there wouldn't be a work order for this.

BY MR. HOFFMAN:

Q. So what would it be called if someone were to -- or is any documentation created by the installer when it is installed?

A. Maybe -- no, not that I can specifically -- to, to be honest.

Q. Okay. And you said it was the -- the designer that -- that designed the -- the handrail that was installed?

A. The original handrail. The second one, I'm not too certain if they just matched it or if they asked the same designer to come in and insert it.

Q. Okay. So it's possible Carnival did that new-installed handrail?

MS. ROSE: Form.

THE WITNESS: It's possible they did it. It's possible a contractor did it. It could have also been the shipbuilder. I'm not too certain.

BY MR. HOFFMAN:

Q. Okay. Because I thought I asked earlier, and it was affirmatively stated that it was the -- the shipbuilder. Thank you for correcting that. Is there a

department within Carnival that would have the authority to design and change a handrail?

A. There likely is, yes.

Q. But you're not aware as to who that would be, or?

A. No, but I can likely get that information for you.

Q. Okay. Please. The title and the name, please. I'm looking at -- I'm going to show you Exhibit 6. And this is the Objections and Responses to the First Request for Production. And I'm going to go to RFP 7, where it says, "All cleaning, maintenance, and inspection logs for the subject area for the 24-hour period immediately preceding the plaintiff's accident." It says, "Carnival does not utilize cleaning, maintenance, and/or inspection logs."

Does Carnival inspect passenger stairways and public spaces on the Panorama?

MS. ROSE: Form.

THE WITNESS: Not sure what you mean by inspect.

BY MR. HOFFMAN:

Q. I mean inspection logs. It says, "Carnival does not utilize inspection logs or maintenance logs." So the question is: Does Carnival inspect passenger

stairways and public spaces on the Panorama?
A. I mean, just because there's no inspection log doesn't mean we don't inspect. I feel like housekeeping looks through things all throughout their shifts and report what needs to be fixed, if anything, but I'm not sure how else to answer that.
Q. Okay. So there's nothing reported related to inspection or maintenance logs because the -- the scope of that responsibility is with housekeeping?
A. It's with all the crew, really. If they see anything that needs to be fixed, see something, say something, they fix it, so -- or they let the respective department know to fix it -- that needs to be fixed.
Q. Okay. And that type of request doesn't go into a log that needs to be completed?
A. Not to my knowledge, no.
Q. Does it go into a database?
A. Not to my knowledge either, no. I know once they tell respective department, if something is broken, then there would be a work -- a work order, which we referred to earlier.
Q. Okay. So besides a work order, would it be recorded anywhere else?
A. Not to my knowledge, no.
Q. Okay. Was there a bartender working at the

time of Dr. Boyle's fall on October 12th?

A. To my knowledge, yes, there was.

Q. Okay. The reason I ask is the -- sorry. The list of people in interrogatory 1 asked for people who were present in the subject area within 30 minutes before or after the incident, but it does not appear to name a bartender. Do you know why that would be?

MS. ROSE: Form.

THE WITNESS: No.

MS. ROSE: Can you show her the document if you're going to ask her --

MR. HOFFMAN: Yeah. Sorry.

THE WITNESS: Yeah, please.

MR. HOFFMAN: Sorry.

MS. ROSE: It's okay. Thanks.

BY MR. HOFFMAN:

Q. So what I'm showing you here is the interrogatory 1 response, and it asks for the names, jobs, employment status of the people present within 30 minutes before or after. And then there's a list of folks, but I didn't see anybody listed as the bartender. I see where it says "assistant server," but I don't know if an assistant server would be defined the same as a bartender.

A. I mean, I truthfully saw a bartender in the

CCTV, if I'm not mistaken. I'm not sure if the position has changed of that crew member when they gave you the printout or the information, but I remember seeing a bartender, if I'm not mistaken.

Q. Okay. It looks like -- I'm looking at the video. There's two gentlemen and a -- a woman. I'll show it to you real quick. And this is the CCTV video that was provided. I don't know when it happens.

MR. HOFFMAN: I'll have this marked as Exhibit 17, please.

(Exhibit 17 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is a CTTV (sic) video that was provided by Carnival. And I'm in the video right now, and it's at 00:04:44 and -- or let me show you. I'm not sharing my screen with you, am I?

A. No, you were. You were. You were.

(Video played for the record.)

BY MR. HOFFMAN:

Q. Okay. So the -- on the screen is a video at 00:04:44, and it looks like Dr. Boyle is approaching the two steps on the landing, and there's a woman at the cash register. Is -- do you know if that's the person that was listed in the interrogatory, Marimar Sarmiento (phonetic)?

A. I --
Q. --
A. I mean, I could get that -- I could get that information for you. I can confirm that for you, but right now I can't, just based off --
Q. Okay.
A. -- what I know. I can't.
Q. Okay. And then looks like there's two other gentlemen at the bar as well. It looks like there's three on that minute, 00:04:30. Would you be able to give me the names of those three individuals?
A. I could as well. It probably was that they -- they gave you -- names of the individuals that actually witnessed.
Q. I'm sorry?
A. I remember seeing them on the other side of the bar --
Q. Well, I can't hear you.
A. -- at the time that Mr. Boyle was coming down.
Q. I'm sorry. I couldn't hear you. You faded out for a second.
A. Oh, sorry. I said it could have been -- that they only gave you the name of the individuals that actually witnessed it. I don't remember seeing those other gentlemen on this side of the bar when Mr. Boyle

was falling. They were, like, around the other side helping other guests.

Q. Got it. Right. But it's just asking for everyone within the subject area 30 minutes before or after. So if you could please --

A. Correct.

Q. -- get the names of those three bartenders and confirm that that's Marimar.

A. Okay.

Q. Thank you.

A. You're welcome.

Q. The -- the accident report dated October 12th, 2024, are you prepared to testify as to the facts in the document?

A. In the accident report?

Q. Yes.

A. I don't remember if I saw that --

Q. Okay.

A. -- document.

MS. ROSE: Michael, are you waiving privilege if you want her to review it?

MR. HOFFMAN: Oh, yes. Sorry. I didn't realize that we hadn't addressed that. Yes. I am not ask -- I'm not asking you to waive privilege if she would -- to be able to testify as to the facts

that are in the report. Do you know if she has a copy of it? Would she be able to, you know, state the facts that are listed?

MS. ROSE: You can ask her.

BY MR. HOFFMAN:

Q. Okay. So Ms. Henry, without reading the document, could you state every fact recorded in the accident report?

MS. ROSE: Form.

THE WITNESS: Do you mean, like, off the top of my head? Because I don't think I've memorized or --

BY MR. HOFFMAN:

Q. Well, no. If you could -- you could take a look at the document. I just don't want you to read it verbatim.

A. Oh.

Q. It's a privileged document, but I do want -- if you could take a look at it, if you could let me know the location, time, mechanism, witnesses --

A. Yeah.

Q. -- statements by -- what photographs.

A. If Lauren agrees.

MS. ROSE: Form. I -- I object to -- to that. If you want to ask specific questions one by one --

BY MR. HOFFMAN:
Q. Okay. Does it say the location of the incident?
A. Okay. Let me -- do you want me to pull it up?
Q. Yes, please, if you would.
A. Okay. One moment.
MS. ROSE: And again, I'll just -- I -- just to clarify, and, you know, Mr. Hoffman confirmed this, by referring to the accident incident report in this case, no privilege is being waived.
MR. HOFFMAN: Correct.
BY MR. HOFFMAN:
Q. If you could please let me know when you have it.
A. Bear with me. I'm trying to make sure this is right. Okay. Yes, I have it up.
Q. Okay. Does it state the location of the incident?
A. Yes, it does.
Q. Tell me what it says.
A. It says, "Spiral atrium lobby stairs, starboard side from deck 4 to deck 3."
Q. Does it say anything about the landing?
A. Yes. And it says, "Landing area."
Q. Okay. Does it state the time?

A. 17:33.
Q. Okay. Does it have a mechanism?
MS. ROSE: Form.
THE WITNESS: I'm -- I'm not sure what you mean by mechanism.
BY MR. HOFFMAN:
Q. Of injury, as to how he got hurt?
A. Yeah, it does an event description.
Q. Okay. Could you say what facts are reported as statements from Mr. Boyle, Dr. Boyle, Ms. Boyle?
A. Well, because this is the accident report, it's just -- it's not going to -- hold on. Okay. I found it. "Guest claimed that after descending spiral atrium lobby stairs, starboard side from deck 4 to deck 3, when he arrived at landing area, he failed to notice two more additional steps, which were ahead leading to deck 3. As a result, he missed those two steps, fell forward, and landed on his left knee onto the ceramic floor ahead, causing injury to his left knee."
Q. Okay. Does it list any witnesses?
A. Let me see. It says --
Q. I'm sorry. I didn't hear you clearly.
A. It said, "Did anyone witness the event?" And it says, "Yes, another passenger," but it doesn't give -- there's no witness statements attached.

Q. Does it have the witness name?
A. Let me scroll down and just confirm for you. One second. It states his wife as the witness.
Q. Okay.
A. And that's it.
Q. Okay.
A. And that's it. That's it as far as witnesses go. I'm scrolling through to make sure.
Q. So when it said another guest, was it a reference to his wife?
A. From what I can see in the document, yeah. It has her listed in here as the only witness.
Q. Okay. And does it say anything about the condition of the area?
MS. ROSE: Form.
THE WITNESS: One second. This is a lot of info on this doc. Bear with me.
BY MR. HOFFMAN:
Q. Okay.
A. No.
Q. Okay. Does it say anything about a handrail or lack of a handrail?
A. No. Most of it just says that the -- the only corrective action was towards the guest for missing his steps, for not seeing the steps, which is why he fell

forward. And it says that there was -- "Area was checked. No corrective action required."

Q. Okay. Is there any reference to any past incidences?

A. No. They usually don't put that in here in the action -- the accident report. That's never, like, a category in here whatsoever. So I'll be honest, I'll say no. But I'm looking through. There isn't.

Q. Thank you.

A. You're welcome.

MR. HOFFMAN: And let me show you -- confirm this is the -- I've marked as Exhibit 11.

(Exhibit 11 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is, again, highlighted by the plaintiff. And this is Dr. Boyle's passenger injury statement?

A. Correct.

Q. Okay. And it's dated October 12th, 2024, correct?

A. Correct.

Q. And the narrative reads -- it says, "Please state in detail what happened at the time of the incident. Walked down full flight of stairs, but he did not see the other two steps about 10 feet away, so he

missed those steps." And then "What" -- it says, "What do you believe caused this accident?" He doesn't remember the actual incident. And then it says, "The isolated two steps."

Has there been any audit or investigation of the steps other than the -- report between --

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. -- October 12th, 2024, and September 2025?

A. Not to my knowledge, no.

Q. Okay.

A. An audit? I'm not sure, like, what you mean by an audit. Like, of how many people have been injured on the steps, or?

Q. Yes.

A. No. I told you there's no specific count or instances or amount of instances that would cause us to --

Q. Would there be -- go ahead. I'm sorry.

A. No. Just, there's no amount of incidences that would cause us to change something or for a safety concern to be raised.

Q. Okay. So in Exhibit 6, which is the request for production -- I'm going to pull it back up. So in request for production 15, it asks for "safety

management system provisions, safety policies, protocols, procedures, and guidelines that were in effect at the time of the plaintiff's accident relating to the inspection, maintenance, lighting, and cleaning of the floor, and/or steps in the area where the plaintiff's accident happened." And then the response says, "Carnival objects at this request. Seek expert opinion."

Do you know the basis for that objection?

MS. ROSE: Form.

THE WITNESS: I just don't think we would've been able to adequately provide that to you. And we did retain an expert in this case, so it's just better for us to defer any questions to him.

BY MR. HOFFMAN:

Q. Do you know if Carnival has a procedure for identifying fall hazards in passenger public places?

A. Not to my knowledge. I mean, we do -- like, when it comes to slip resistance, I know we do test the flooring yearly, but not -- not specific to this case.

Q. Okay. But aside from slipping, there are other ways to fall, correct?

A. Correct.

Q. So is there any procedure to identify fall hazards in passenger public spaces?

A. I think we just upkeep our ships to standard and code and just make sure that there's no area of concerns once we're putting ships out for the first time. And this is not -- this ship isn't even the first of its class. It's the last of the class. So I don't think even the area that you're referring to is of concern. The same area is on the two other ships of the class.

Q. Even though there were nine instances within two years, it's not a -- wouldn't qualify as a concern for Carnival?

MS. ROSE: Form.

THE WITNESS: If you think -- not really. If you think about how many people are on those ships day in, day out -- this is a 25-day cruise. It's a long cruise. And how many people are on these ships? Nine. Yes, we do care about our guests, but nine out of all the people that are on the ships constantly, I don't think it raises a huge concern for safety.

BY MR. HOFFMAN:

Q. How many number incidences would raise a huge concern for safety?

MS. ROSE: Form.

THE WITNESS: Again, we don't have a specific

number. We don't -- there's nothing that flags -- or raises a flag to us. It's just the safety team. They look at things constantly. They add things constantly. They take away things constantly. It's just based on what they see fit.
BY MR. HOFFMAN:
Q. And the severity of a person's injury would not be a cause to trigger that review?
MS. ROSE: Form.
THE WITNESS: No. Again, everybody's -- like, all these incidents are different. Everybody's different. We don't know what other guests have medically or, you know what I mean, to that effect. So it's going to be a different answer for every guest, or a different situation.
BY MR. HOFFMAN:
Q. Does HESS require a hazard identified on one vessel to be evaluated on sister vessels?
MS. ROSE: Form.
THE WITNESS: Not to my knowledge.
BY MR. HOFFMAN:
Q. Is that why the same rail would go on all five ships?
MS. ROSE: Form.
THE WITNESS: I think it's just for

uniformality. I don't think it's because of -- this instance didn't -- wasn't the reasoning behind us putting up that second handrailing, so --

BY MR. HOFFMAN:

Q. But -- okay. So -- but the question was, does HESS require a hazard identified on one vessel to be evaluated on a sister vessel?

A. That wouldn't apply here because there was no hazard identified.

Q. Okay. So that wasn't the question. Does HESS require a hazard identified on one vessel to be evaluated on sister vessels?

MS. ROSE: Form.

THE WITNESS: I -- I don't know that. That -- that question I cannot answer. I do not know.

BY MR. HOFFMAN:

Q. Okay. Does any Carnival policy -- policy require a handrail on each side of a passenger stairway?

MS. ROSE: Form.

THE WITNESS: Not that I know off the top of my head, no.

BY MR. HOFFMAN:

Q. Okay. If one exists, would you have reviewed it prior to today?

A. I'm sorry?

Q. If one did exist, would you have reviewed it prior to today in preparation?
A. If it was presented to me, yes.
Q. So we asked a -- we talked a little bit about who designed that handrail, and I want to ask, on October 12th, 2024, did Carnival have the right at any moment to install a rail?
MS. ROSE: Form.
THE WITNESS: I'm not understanding the question. I'm sorry.
BY MR. HOFFMAN:
Q. Yeah. Did Carnival have the right, on October 12th, 2024, to install the handrail, that second handrail on that two-step?
A. Did they have the right?
Q. Yeah.
A. Seeing as it is our ship, I think we had the right, yes.
Q. Okay. So the Panorama was designed and constructed by the Fincantieri shipyard prior to the delivery of the vessel, right? That's what Carnival swore, right?
A. Yes.
Q. Okay. And then it swore that it added a handrail to the atrium stairs of the Panorama and its

four sister ships all -- and am I correct to say that that -- the installation all occurred in November 2025?

MS. ROSE: Form.

THE WITNESS: I only know of the Panorama. I can't speak for the other ships. I don't know if it was gradual or -- I don't think it was all on the same day. I -- I can't say -- speak for that.

BY MR. HOFFMAN:

Q. You don't know if it was all around the same month even, correct?

A. Yeah. I'm not sure of that.

Q. So Carnival has authority over handrail design, correct?

MS. ROSE: Form.

THE WITNESS: Again, I think it's the shipbuilder. I'm sure we have a final say of yes or no if we want things put in, but I can't be certain of who put the handrailing in.

BY MR. HOFFMAN:

Q. Okay. But Carnival hadn't exercised its authority over the handrail design when it installed the second handrail, correct?

MS. ROSE: Form.

THE WITNESS: I'm not certain of that. Design, maybe. The installation, maybe. I'm not

too sure if -- I know we have final say in if we like how things look when they're put in, but I'm not sure if we had a full hand in the design of it.

BY MR. HOFFMAN:

Q. Okay. But it has the authority to change the design, correct?

A. Yeah. If we -- if we don't like something, we can say no. Or if it doesn't apply to the ship the way we want, then yeah, we can say no.

Q. Okay. Or if it is not as safe as it could be, you could also make a change as well?

A. Yes. Yeah, we could.

Q. Do you know if anyone interviewed the bar crew on duty about the steps?

MS. ROSE: Form.

THE WITNESS: --

MR. HOFFMAN: Court reporter, were you able to get that? I -- that was unclear. I'm sorry.

THE WITNESS: Sorry.

BY MR. HOFFMAN:

Q. It's okay.

A. Do you want me to repeat?

Q. Please.

A. I don't recall seeing any crew member statements in this incident.

Q. Thank you. Do you know if there's any hazard analysis that was conducted in the subject area where Mr. -- where Dr. Boyle had fallen?

A. No, not to my knowledge. There was no hazard analysis conducted.

Q. Did -- how did -- what -- what -- what would be the -- the document? How would it begin that the process to install the second handrail would begin?

MS. ROSE: Form.

THE WITNESS: I'm not part of that department, but Mr. Suhe and his team would've, over many -- actually, it took longer than many months, but over many months would've decided whether or not this is something that they wanted to do. I'm not sure exactly how they came about that decision.

BY MR. HOFFMAN:

Q. Do they create a report or a proposal in order for something like that to be conducted on five ships?

A. I have no idea exactly how that came about.

Q. Okay. Does the November 16, 2025, handrail provide a safer alternative that was available to Carnival prior to its installation?

MS. ROSE: Form.

THE WITNESS: No, I don't think it -- I don't think it does. A safer -- I'm sorry. I didn't

really understand your question.

BY MR. HOFFMAN:

Q. Would Mr. Suhe create a report or a proposal or -- in order for a second handrail to be installed on five ships?

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. Do you know?

A. Is that your final -- is that your final -- okay. I'm not sure. I'm not sure what kind of procedures they go through to decide that. If they propose it, if they make the final decision, if they're the ones that have the say so. I can't speak for that. It's out of my scope of knowledge for this one.

Q. I want to go to Exhibit 3, which is the Answer and Affirmative Defenses. And we'll go through them. I'm going to pull them up real quick. The fourth affirmative defense, "Carnival asserts that Plaintiff's damages were caused in whole or in part by the Plaintiff's own acts of negligence, including but not limited to the failure to exercise reasonable care for his own safety. Therefore, Plaintiff's damages, if any, must be reduced by the amount attributable to Plaintiff's comparative or relatively fault therein." And I want to ask, does Carnival contend he was looking

at the atrium display when he stepped?

A. No. We're -- we don't know what he was looking at, but he was not exercising reasonable care. We could say that. That's all I can say for that one.

Q. Is it -- what's the basis for the determination that he wasn't using reasonable care?

MS. ROSE: Form. Form.

THE WITNESS: First -- first of all, he was not using the handrailing that was readily accessible to him. Second off, he admitted that he was not looking down at the steps in his statement and what he told security. And the statement that his wife actually wrote for him, he did not write that statement, but he just wasn't paying attention.

BY MR. HOFFMAN:

Q. Okay. Does Carnival contend he should have been using a cane?

MS. ROSE: Form.

THE WITNESS: I'm not a medical expert, so I'm not sure. And I won't speak on behalf of Carnival by saying that, because I am not a medical expert, but I'm not sure.

BY MR. HOFFMAN:

Q. -- that's the basis for Carnival's defense.

A. Okay.

MS. ROSE: I'm sorry. I didn't hear the beginning of the question.

BY MR. HOFFMAN:

Q. So that -- you don't know if that is a -- a basis for Carnival's defense that he should have been using --

MS. ROSE: Form.

THE WITNESS: I'm not sure.

BY MR. HOFFMAN:

Q. Okay. Does Carnival contend he should have remembered the steps from his October 2021 Panorama cruise?

A. I think -- I think he -- he knew the steps. He's familiar with the ship. He's been on it once before. Whether or not he remembered the steps, that still doesn't attest to the fact that he was not paying attention. He admitted to that.

Q. Okay. But -- so Carnival doesn't contend that he should have remembered the steps from three years prior, correct?

MS. ROSE: Form.

THE WITNESS: I don't know how to answer that without going back into the fact that whether or not he remembered them. It doesn't matter if he's

not paying attention.
BY MR. HOFFMAN:
Q. Okay.
A. It's not something that he's using daily, so I -- I don't know why he would specifically remember the entire area, but those last two steps, I feel like he's been down them without fail -- failure, so I don't understand why he wouldn't.
Q. Does Carnival contend he should have held the left side rail?
A. 100 percent, yes.
Q. Was it visible and available to a passenger approaching on the right side beside the bar?
A. He could have chosen, when he came down the steps, to go towards the other handrail. Yes, he could have. Whether he wanted -- it's -- it's really his choice at that point. The handrail is available. It's readily available, especially a guest of his age. I would hope that he would use the handrail.
Q. But he said he wasn't aware of any further steps. So if he -- if -- if he didn't see the handrail on the -- if he -- if he was approaching on the right side bar and didn't see any steps, how would the left side rail have helped?
A. It would've helped him to catch himself --

Q. Okay.

A. -- at least, from those two steps, and he wouldn't probably have had an injury at that point.

Q. But if he's on the right beside the bar, he's far away from that left handrail, correct?

MS. ROSE: Form.

THE WITNESS: Well, that's him not paying attention again. The handrail is readily available to him. And he walked down a full flight of stairs where the handrail is extended from those stairs and there's another handrail on. So I'm not understanding why he didn't use the second set of -- the second handrail.

BY MR. HOFFMAN:

Q. Was there anything preventing Carnival from continuing the second handrail that Dr. Boyle experienced on the larger atrium set of stairs?

MS. ROSE: Form.

THE WITNESS: I think the bar, honestly. I'm not too sure exactly why we didn't put that second handrail in initially. I don't think we thought it was necessary. You would come down the stairs and just use the handrail that's readily available to you. I didn't think there was an issue. There still isn't an issue if we decided to keep it as

one. There's a handrail readily available to the guests.

BY MR. HOFFMAN:

Q. But if one's walking towards the right side near the bar, that left handrail is not within their reach, correct?

MS. ROSE: Form.

THE WITNESS: I think that's guest preference to walk towards the right side of the bar, if there is a handrail to the left. I just don't think Mr. Boyle was paying attention.

BY MR. HOFFMAN:

Q. Did Dr. Boyle say that he wasn't paying attention --

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. -- to what was going on?

A. I'm pretty sure he said that he wasn't aware of the two steps -- they could have been, could not have been. I can't speak for them, because I did not investigate or look at the investigation --

(Proceedings interrupted due to technical difficulties; a portion of the proceeding was not recorded.)

BY MR. HOFFMAN:

Q. -- Carnival says, "Plaintiff has failed to mitigate his damages, if any, thus precluding or diminishing the plaintiff's recovery herein to the extent such mitigation would've diminished or avoided Plaintiff's alleged loss or injuries. For example, Plaintiff may have failed to comply." Comply with what, are -- is that in reference to?

A. I'm assuming that's in reference to doctor's orders for him to disembark the ship and get medical attention shoreside, which he declined.

Q. Did Carnival --

A. And that could have -- sorry. And that could have -- as advised to him.

Q. Did Carnival -- does Carnival contend he should have had surgery in Malaysia or Vietnam?

MS. ROSE: Form.

THE WITNESS: I think we just wanted to do what was best for the guest at this time, to make sure that if his injuries were past our own medical care, what we could have given him, that we could have at least offered him to see a -- a specialist or someone in wherever he is. And he would've had to do -- do so if the injuries were worse than what they were, I'm sure he would've had to debark at that time. But I think that played a huge factor

into the aggravation of his injuries, yes.

BY MR. HOFFMAN:

Q. So Carnival contends that he should have had surgery in either Malaysia, Vietnam, or the Philippines?

MS. ROSE: Form.

THE WITNESS: I'm not sure what the issue is with us wanting the best outcome for our guests in this situation. If we can't give him the surgery on board, why wouldn't we offer it to him?

BY MR. HOFFMAN:

Q. Did the ship recommend -- ship's physician recommend that he disembark for purpose of having surgery?

MS. ROSE: Form.

THE WITNESS: Yes. Not for the purpose of having surgery, but he wanted him to disembark and be seen by an actual hospital.

BY MR. HOFFMAN:

Q. Okay. Was there an against-medical-advice form that Dr. Boyle refused to follow the recommendations to disembark?

MS. ROSE: Form.

THE WITNESS: Not that I can remember off the top of my head. There usually is in instances like this.

BY MR. HOFFMAN:
Q. Okay. Does Carnival's incident reports state that Dr. Boyle acted improperly before his injury?
MS. ROSE: Form.
THE WITNESS: In what -- in what sense? How long before his injury? What are we referring to?
BY MR. HOFFMAN:
Q. Is there any factual statements that Dr. Boyle was acting improperly before he stepped off --
MS. ROSE: Form.
BY MR. HOFFMAN:
Q. -- injury?
A. Improperly and not using caution, I think are two different things. Improperly would suggest that he's acting a little outrageous or differently than other guests. Is that what you're referring to?
Q. I mean, if not using caution is not within the scope of acting improperly, then I guess they're different things. Would that --
A. Well, that's how I interpreted it.
Q. Okay. Would that mean to suggest though that, just because someone's not paying attention, it doesn't mean that they were acting improperly?
MS. ROSE: Form.
THE WITNESS: I mean, it's situational. I

don't -- I don't think he was acting improperly. I just don't think he was using reasonable care when he was coming down the steps. I -- I just -- I don't see how he was if he wasn't using the handrailing that was available to him.

BY MR. HOFFMAN:

Q. Did you read Dr. Boyle's testimony before today's deposition?

A. His deposition testimony?

Q. Yeah.

A. Yes. I read through some of the answers. I did.

Q. Okay. And did he state that he was aware of the handrail on the left side?

MS. ROSE: Form.

THE WITNESS: Not that I can remember off the top of my head. Depositions are longer, especially, but I can't recall.

BY MR. HOFFMAN:

Q. Okay. But if he testified that he wasn't aware of the handrail on the left, it's not that he chose to not hold that handrail, correct?

MS. ROSE: Form.

THE WITNESS: Again, I don't think he was really paying attention to the left side of him at

that time.

BY MR. HOFFMAN:

Q. Understood.

MR. HOFFMAN: I think I'm about done. Could I just get five minutes to review and I'll come on back --

THE WITNESS: Perfect.

MR. HOFFMAN: -- and come back at 12:25?

THE WITNESS: Perfect.

MR. HOFFMAN: All right. Thank you.

THE VIDEOGRAPHER: We are going off the record. The time is 12:19 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:26 p.m.

BY MR. HOFFMAN:

Q. Ms. Henry, do you know when Carnival first began considering the second handrail, the two steps?

MS. ROSE: Form.

THE WITNESS: Off the top of my head, I can tell you the year. I'm pretty sure it was the summer of 2024.

BY MR. HOFFMAN:

Q. Okay. So since the installation of that handrail, is the two-step drop safer with the handrail

on both sides than just one?

MS. ROSE: Form.

THE WITNESS: No, because guests -- it's situational to each guest. Sometimes guests use the handrail, sometimes they don't. In this case, Mr. Boyle -- or Dr. Boyle did not. So it's really up to the guests.

BY MR. HOFFMAN:

Q. But now that there's two, it's twice as likely that someone's going to use the handrail, correct?

MS. ROSE: Form.

THE WITNESS: No. It doesn't change anything, to be completely honest with you. We hope they use the handrail. We hope that they apply reasonable care, but guests do as they want on the ships.

BY MR. HOFFMAN:

Q. So Carnival -- Carnival is indifferent as to whether or not one or two handrails is placed in relation to whether or not it makes it safer?

MS. ROSE: Form.

THE WITNESS: We -- we wish to make a safe cruise for all of our guests. And obviously, we install handrails so that our guests can use it and exercise reasonable care. But that doesn't mean that we're going to police them into using the

handrails, but we do put them there for their safety.

BY MR. HOFFMAN:

Q. I mean, looking at the handrail, that step, if -- I'm going to go back to sharing my screen real quick. I just have a question about it. Okay. So you see my screen okay?

A. Yes.

Q. All right. So I'm going to take a snapshot here, this area here, and I'm going to open that up.

MR. HOFFMAN: I'm going to use that as Exhibit 18.

(Exhibit 18 was marked for identification.)

BY MR. HOFFMAN:

Q. Okay. So we're looking at the -- are you able to see my screen with the picture of the stairs, the two stairs?

A. Yes.

Q. Okay. If somebody is on the right side of the handrail, from our perspective --

A. Uh-huh.

Q. -- how would somebody walking on the far side of the stairwell be able to use a handrail if there's only one?

MS. ROSE: Form.

THE WITNESS: Well, you can see the extension. Like, it's not like there's a cutoff between the handrails between the two stairs. I don't think if there wasn't two steps, there would be an extension on the handrail on the -- our right-hand side.

BY MR. HOFFMAN:

Q. On our right-hand side, there -- there is a handrail, correct?

A. Yeah, there is.

Q. But what I'm saying is on the other side where that gentleman's walking up, if somebody's walking on those stairs, is -- would it be safer if there was a second handrail that that person would be able to actually access?

MS. ROSE: Form.

THE WITNESS: The other handrail is accessible as well. At the time that Dr. Boyle was walking down the steps, there was no one in his way. It wasn't overcrowded. The handrail was available to him. There was no one walking down on the right-hand side that affected our right-hand side, that affected him from using that handrail, or going towards that handrail.

BY MR. HOFFMAN:

Q. Right. But the issue is he testified that he

never looked to the left side, so he didn't know that handrail was there. And the question is, if a second handrail was on that stairs, if it would've made it safer so that Dr. Boyle would've had some notice, because he was -- he never looked to the left. Does having a second handrail make it safer for guests?

MS. ROSE: Form. Asked and answered.

THE WITNESS: Yeah. I -- I mean, I already answered that, but I think it doesn't -- as you know, guests will do as they want. Whether there's two handrails, one handrail, they will use it if they want to, not use it, not look in the direction of the one on the right or right. They kind of do as they please when it comes to -- that's why they have to exercise their own reasonable safety and care on the ships.

BY MR. HOFFMAN:

Q. And that's also why two handrails is safer than one, because passengers will do what they want, correct?

MS. ROSE: Form.

THE WITNESS: No. Like I said, whether there's two or one, they will still not use them if they wish.

BY MR. HOFFMAN:

Q. Okay. So other than not using the handrail and not looking down, does Carnival have any other facts supporting comparative fault by Dr. Boyle?

A. Yeah. The fact that he admitted that he wasn't paying attention, that, one, he did not see the steps and, one, he did not see the handrail. And in the CCTV, you could see him looking off to the left. I mean, well, it would be his right.

Q. Okay. Right. So other than not using the handrail and not looking down, does Carnival have any -- so you're saying that his not paying attention also is a fact that he was at fault?

A. Yeah. I mean, I would hope that. And the -- everything is well-illuminated. Whether it's nighttime or -- or -- or daytime, you can see everything. You can see all the steps. There's no way you can't see -- everything is well lit. I don't really understand how he wouldn't be at fault in some way for his own injuries.

Q. But Carnival has reports of nine other people in the two years prior having the same type of fall, just like Dr. Boyle, correct?

MS. ROSE: Form.

THE WITNESS: Not the same. Similar. Also, there's other contributing factors to that that we

are not aware of, because I did not -- I wasn't prepped on those other cases as well.

BY MR. HOFFMAN:

Q. But Carnival has the ability to note that information if they had it, correct?

A. Note what information?

Q. Any complicating factors, would you be able to get that information to me if it's available?

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. That distinguishes these prior incidences that you say are not similar?

A. Yeah -- just different, but, I mean --

MR. HOFFMAN: Court Reporter, are you able to get that?

THE REPORTER: No, sir. That was very faded.

THE WITNESS: Sorry. Okay. What did I want to say? Now I don't remember. I don't -- I don't think they would be necessary. In this case I can try to get them from (sic) you. I mean, we're not keeping anything from you. If you'd like that information, sure.

BY MR. HOFFMAN:

Q. I -- I mean, you're making distinctions based on unknowns, and if they're knowns, I would like to know

them as well, you know?
A. Okay.
Q. Okay.
MS. ROSE: Do you have a specific question, Michael?
MR. HOFFMAN: No. It was -- it was regard -- relating to the incidences, you know, the potential underlying circumstances. But no, I don't -- I mean, that was her answer, so --
I don't have any further questions.
Thank you, Ms. Henry. It was good to see you.
THE WITNESS: You're welcome. You too.
MS. ROSE: Okay. We just took a break a minute ago, but do you -- do you need another break? Because I have some questioning for you as well.
THE WITNESS: No. Go ahead.
MS. ROSE: Okay. Give me just a second. I'm just getting my documents. Okay.

CROSS-EXAMINATION

BY MS. ROSE:
Q. Hi, Ms. Henry. How are you doing so far today? Doing okay?
A. Good. Thank you.
Q. Good. Okay. So just to -- to be clear and to

clarify, you're here today as Carnival's corporate representative, and you yourself, you're not an engineer or an architect or an expert in either of those fields, correct?

A. Correct.

Q. Okay. And that's why Carnival relies on experts in those fields and the third parties it contracts with to build its ships, such as the shipbuilder in this case, which you've testified was Fincantieri, correct?

A. Correct.

Q. Okay. So let's talk about this particular cruise, this -- this incident for a minute. And if you need some -- a document to refresh your recollection, please just let me know. We've established that the -- this incident occurred on October 12th of 2024; is that correct?

A. Correct.

Q. Okay. And that would be on the Carnival ship, the Panorama, correct?

A. Correct.

Q. Okay. And on your direct examination, you mentioned that this was a Journey cruise. Can you explain what that means?

A. So they start somewhere that's not in the

United States, if I'm not mistaken. And for this one, they started in Singapore, and then they ended in Los Angeles. This is a 25-day cruise.

MS. ROSE: I will share my screen, and we can mark this as -- as D1. It's a document that's in the record in this case as Carnival 58.

(Exhibit D1 was marked for identification.)

BY MS. ROSE:

Q. And I'll -- and I will make it bigger because the font is quite small. Okay. Can you see -- this is just a one-page document. As I said, it says Carnival 58 at the bottom. Can you see up here where it says, "Carnival Booking Details"?

A. Yes.

Q. Okay. And just to confirm with you what you've just testified about here, it says, "Itinerary name, Journeys Trans" -- it says, "Transpaci," but is that short for Transpacific?

A. Yes.

Q. Okay. And is -- here, duration, it says 25 days?

A. Yes.

Q. Okay. And is -- that confirms what you just testified to, that the plaintiff's voyage on the Panorama was a Journeys Transpacific that was a 25-day

cruise; is that correct?

A. Yes.

Q. Okay. And from my understanding, voyages like this are to reposition the ship from one part of the world into another; is that correct?

A. Yes.

Q. Okay. And in this case, it was starting in Singapore and then ending in Los Angeles, California. So it was a repositioning of the Panorama from an Asian itinerary to a West Coast of the United States-based itinerary?

A. Yes.

Q. Okay. And if you see here, the sail date says October 12th, 2024, correct?

A. Correct.

Q. Okay. Take this down. And that's the -- the same date that we've already established that Mr. Boyle -- or excuse me, Dr. Boyle had his incident, correct?

A. Correct.

Q. Okay. So his incident happened on the day he boarded the ship, correct?

A. Yes.

Q. Okay. And if -- if I recall correctly, do you recall, from his deposition, he said that it happened -- he'd only been on the ship but maybe a half an hour to

an hour before the incident happened. Do you recall reading that in his deposition?

A. Yes.

Q. And is Carnival aware -- did Dr. Boyle -- isn't it true he stayed on the ship for the entire 25-day voyage?

A. Yes.

Q. If Dr. Boyle had wanted to seek further medical attention, since it was the very first day of the 25-day voyage, could he have disembarked the ship to seek immediate medical attention?

A. Yes.

Q. Okay. Okay. I'm going to share my screen with you again. I'm showing a document that's also already in the record of this case. It's marked as Carnival 71 through 73. Okay. Can you see the document now, Ms. Henry?

A. Yes.

Q. Okay. As I said, it's a three-page document. Starts at 71 and it ends at Carnival 73. Up at the top here, it says Carnival Dash. Do you see that?

A. Yes.

Q. Okay. Are you familiar with this document, in general --

A. Yes, I am.

Q. -- what this is? Can you just explain what the Carnival Dash is?
A. It's basically where the guest profile is. Their email address, all their personal information will be on this profile, as -- as well as how many cruises they have coming up or have taken previously.
Q. Okay. So one of the purposes of this document is to show the guest's cruise summary as it says here; is that correct?
A. Yes.
Q. Okay. So starting on the first page of this document, Carnival 71, and then it takes all the way to Carnival 73, so two and a half pages, essentially, of prior and/or future sailings that -- that this particular guest, the plaintiff in this case, has taken on Carnival; is that correct?
A. Correct.
Q. Okay. I'm not going to make you sit here and count all of them, but fair to say it's a good number of prior Carnival cruises; is that correct?
A. Correct.
Q. Okay. And looking here, I'm going to direct your attention. Do you see where my hand is here?
A. Yes.
Q. Okay. And it says, going down to its sail

date, October 12th, 2024, ship, Carnival Panorama, destination, Journeys Transpacific. So is this entry right here that says October 12th, 2024 -- is this the subject cruise?

A. Yes.

Q. Okay. And I'm going to go back in time a little. Okay. Do you see where my hand is now where it says October 16th, 2021?

A. Yes.

Q. Okay. And what ship did the plaintiff sail on on that date?

A. Panorama.

Q. Okay. That's the same ship as the -- the subject cruise, correct?

A. Yes.

Q. Okay. So does this document confirm that the plaintiff had previously sailed on this same ship, the Carnival Panorama?

A. Previously, yes, he had.

Q. Okay. And before and after the -- the prior Panorama cruise, he has several cruises on other ships as well, correct?

A. Yes.

Q. Okay. And one of those ships I'm going up to, do you see here sail date of February 13th, 2022?

A. Yes.
Q. Okay. And what ship is that on?
A. Horizon.
Q. Okay. And as you previously testified, the Horizon is in the same class as the Panorama, correct?
A. Yes.
Q. And the Horizon has or has that same configuration in the atrium with the landing and the two -- two additional steps afterwards, correct?
A. Correct.
Q. Okay. And do you see here -- now I'll direct your attention to a sail date of September 13th, 2025. Do you see that?
A. Yes.
Q. Okay. And that would have been approximately one year after the subject incident in this case, correct?
A. Correct.
Q. Okay. And what ship did the plaintiff sail on on that date?
A. The Panorama.
Q. So a year after the subject cruise, the plaintiff sailed on the same ship, the Panorama, an additional time, correct?
A. Correct.

Q. Okay. And he's had -- since -- since that date, he's had, on this document, three more additional cruises on Carnival, correct?

A. Correct.

Q. Okay. Were you able in -- in your capacity as claims adjuster to search whether there -- the plaintiff has sailed on any additional cruises between the -- the date that this document was printed and today?

A. Yes. He actually -- I think it was Firenze in August of this year that he went on.

Q. Okay. So in addition to the -- the cruises listed on this document, the plaintiff has also sailed one additional time in August of 2026 on the Firenze?

A. Yes.

Q. Okay. And I know you did mention that you reviewed at least portions of the plaintiff's deposition testimony, correct?

A. Yes.

Q. Okay. Did you recall where he testified that at the -- I can't recall if it was the time of the incident or the time of his deposition, he was one cruise away from being a Diamond-status Carnival cruiser. Do you recall that -- reading that?

A. Yes.

Q. Okay. Can you explain what a Diamond-level

cruiser is?

A. Essentially, it would have to mean that Mr. -- Dr. Boyle has been on a plethora of different cruises over his time sailing with Carnival, and Diamond is pretty much the top of the line for our cruisers. So it just essentially means he cruises a lot with us, and he also probably spends a good amount as well with us while on board.

Q. So Diamond status is the top, or if not the top, as very close to the top of the status that a cruiser could be at the time that he took this cruise?

A. Correct.

Q. Okay. And we've looked at the CCTV footage of the incident a little bit during this deposition, right? Prior to today's deposition, did you have the opportunity to review the CCTV in its entirety?

A. Yes, I did. I think I watched up to the part, actually, where Dr. Boyle -- a little bit after his incident.

Q. Okay. So from the time the CCTV started until when he had his incident?

A. Yes. And there were guests helping him up. That was the time.

MS. ROSE: Okay. I'm going to share with you a document I'll mark as D3, and it's just a -- it's

a still shot from the CCTV.

(Exhibit D3 was marked for identification.)

BY MS. ROSE:

Q. Okay. Can you see it?

A. Yes.

Q. Okay. And from your review of the CCTV, do you recognize this man in the -- in -- on the two steps as the plaintiff, Mr. Boyle -- or Dr. Boyle? Excuse me.

A. Yes, I do.

Q. Okay. Based on looking at this and your review of the CCTV, are there any other persons on the steps with Dr. Boyle at this time?

A. Not on those two steps, no.

Q. Okay. There's one person behind him, correct?

A. Yes. Looks like his wife.

Q. Okay. Is there any person in front of him blocking his potential view of the steps?

A. No.

Q. Okay. And are there any people on either side of him blocking his view of the steps and/or his access to the available handrail?

A. No.

Q. Okay. And based on your view of this photo and the CCTV, does the handrail that would be on Dr. Boyle's left-hand side seem to be within reach of him as

he walks down those two steps?
A. Yes, it does.
Q. And -- I can try to zoom a little -- zoom in a little bit. Where does it appear that Dr. Boyle is looking as he steps on these two steps?
A. In this photo, it kind of looks like he's actually looking down, like, scratching his mouth or his nose or something, but it also looks like he's looking to the side.
Q. And I'm sorry, I didn't mean to cut you off. Do you agree with me that he does appear to be looking down at the steps as he steps onto them?
A. Yeah, he does, actually, in this photo.
Q. Okay. Okay. And based on the photo we just looked at and your review of the CCTV, the plaintiff was not looking at the atrium bar at the time he fell, correct?
A. It doesn't seem like he was at all. It looks like he was actually looking down in that photo.
Q. And based on the photo you just looked at and the CCTV, at no time did the plaintiff choose to utilize the available handrail to him as he went down those two steps, correct?
A. Correct.
Q. Okay. So talking about the design of that

area and those two steps in particular, Ms. Henry, can you tell me, Carnival wouldn't take part in designing the individual specifics of those steps, such as the riser height or the step width; is that correct?

A. Correct.

Q. Those are decisions that would be in the hands of the shipbuilder, correct?

A. Correct.

Q. Okay. In regards to the handrails that are -- or that was in place at the time of the incident -- sorry, withdrawn. I'll ask it a different way.

In regards to the decision to place a handrail on stairs or not, those decisions are also for the shipbuilder, because isn't it true, Ms. Henry, that Carnival relies on the shipbuilders to make sure the ships are in compliance with any applicable standards and codes, correct?

A. Correct.

Q. Okay. And when the ship was delivered from Fincantieri to Carnival, to your knowledge, there was nothing about the design of the subject stairs that was designed or rejected that -- excuse me, that was denied or rejected by Carnival, correct?

A. Correct.

Q. Okay. And if Carnival thought or had

knowledge that an area of its ships posed a danger to its guests, would it leave that area open for guests to use?

A. If we posed it as a danger, no, we would not.

Q. And making adjustments to an area does not mean that it was previously unsafe, correct?

A. Correct.

Q. Okay. When Mr. Hoffman was asking you questions, he asked you whether there was an amount of incidents that would need to happen for Carnival to make a change. Do you remember being asked that question?

A. Yes.

Q. Okay. And I just want to clarify, when you said, "There's no amount of incidents," did you mean there's no black-and-white rule, meaning this number of incidents means we have to make a change? Is that what you mean?

A. Yes, that's what I mean.

Q. Okay. And speaking of incidents, you talked a little bit about the -- some of the prior incidents that have been disclosed in -- in this case; do you recall?

A. Yes, I do.

Q. Okay. And can you confirm that none of the incidents that were disclosed in discovery, in the description of them that was given by the guests, which

we have provided, you know, been produced to Plaintiff in this case, none of those incidents mention it as a cause of the incident that the guest was distracted by the LED display in the atrium, correct?
A. Correct.
Q. And we've already said that the Panorama is part of the Vista class, correct?
A. Correct.
Q. Okay. And the two other ships in the Vista class are the Vista and the Horizon?
A. Yes.
Q. Okay. And can you confirm for me, do you know when -- and if you need something to refresh your recollection please let me know. Can you tell me when the Panorama, the subject ship, first entered into service?
A. 2019.
Q. Okay. Do you know what month?
A. Not that I can remember. I'd probably have to refer.
Q. Okay. I'll see if there's something I can -- to get to refresh your recollection, but if not, we can confirm that it was 2019, correct?
A. Correct.
Q. Okay. And the Vista was the first ship in

this class; is that correct?
A. Yes.
Q. Okay. And when did that enter into service?
A. 2016.
Q. Okay. And the Horizon came next. When did that enter into service?
A. 2018.
Q. Okay. So 2016, 2018, and 2019 were the years that the ships in this class entered into service, correct?
A. Correct.
Q. Okay. And all of the incidents that were discussed -- were disclosed in this case and were discussed on your direct examination, all of those happened after all three of the ships were already in service, correct?
A. Correct.
Q. Okay. And because the -- this ship, Panorama, was the -- the last of the class -- of the Vista class, correct?
A. Correct.
Q. Okay. So the Vista had been -- and then the Horizon would have been into service about a year, maybe a year and a half prior to the Panorama going into service, correct?

A. Yes.

Q. And in that time, Carnival had no indication that there was any hazard or dangerous condition with the configuration or the design of the subject steps on the Vista or the Horizon that would have given them notice about anything on the Panorama; isn't that correct?

A. Correct.

Q. Okay. And finally for you, since we've discussed the accident report, and just confirming that no privilege is being waived, do you recall being asked some --

MS. ROSE: Sorry, Michael, was that for me?

MR. HOFFMAN: What's that? No.

MS. ROSE: Oh, I thought you were waving at me or something. Okay.

BY MS. ROSE:

Q. Do -- do you recall being asked some questions about the accident report in this case?

A. Yes, I do.

Q. Okay. Do you still have access to it?

A. Yes.

Q. Okay. Is there anywhere in the report that discusses Carnival's position on what caused Plaintiff's incident?

A. Yes, there is.
Q. Okay. Can you read to me what Carnival stated was the cause of Plaintiff's incident?
A. "Said guest claimed that after descending spiral atrium lobby stairs from deck 4 to 3 when he arrived at landing area, he failed to notice two more additional steps while -- which were ahead leading to deck 3. As a result, he missed those two steps, fell forward, and landed on his left knee onto ceramic floor ahead, causing injury to his left knee."
Q. Okay. Thank you. And is there -- is there something in the report that is called a cause analysis?
A. Let me look for the cause analysis. I did see it earlier. I actually see -- all I'm seeing is the corrective actions taken, which there was not because the area was clean.
Q. Sorry. I didn't mean to interrupt you.
A. No, you're fine. There was no corrective actions taken towards the area. I'm not seeing a cause analysis on this document, no.
Q. If I could help you along, if you just want to scroll down, it is an -- an eight-page document. At the top of Page 7.
A. Yes.
Q. May I direct your attention to that?

A. Yes.
Q. Okay.
A. Yeah. Distractions.
Q. Yeah. Can you read what it says in that box, please?
A. It says, "Unsafe act, poor judgment/personal factors." And then it says, "Lack of attention." And it says, "M/guest mentioned that he could not see the steps. Thus, he missed those steps and fell forward."
Q. Okay. And directly under that, where it says, "Preventative action," can you read that for me, please?
A. "Guest was advised to be mindful of his surroundings."
MS. ROSE: Okay. Okay. Thank you, Ms. Henry. I have nothing further for you.
THE WITNESS: Thank you.
MR. HOFFMAN: I don't have any further questions.
THE VIDEOGRAPHER: Okay.
MS. ROSE: Thank you.
THE REPORTER: Okay. Is she going to read or waive?
MS. ROSE: We'll waive.
THE REPORTER: Okay. And will there be any orders at this time?

MR. HOFFMAN: Can I get an email to send you the exhibits? And yes, I'd like to place an order.

MS. ROSE: Yes. And we'll please take a copy. And yes, I need -- I have three exhibits, so --

THE REPORTER: Yep, absolutely.

MS. ROSE: Do you want me to just put them in the chat?

THE REPORTER: I will put my email address in the chat. That way, you have -- both have it.

MS. ROSE: Are we off the record?

THE VIDEOGRAPHER: Before we go off and conclude, does anyone want to order the video?

MR. HOFFMAN: No, not at this time.

THE VIDEOGRAPHER: No?

Ms. Rose, would you want the video?

MS. ROSE: Not at this time as well, but obviously if -- do we want to reserve if we will need it, you know, in the future, have it preserved.

THE VIDEOGRAPHER: Okay. This concludes the deposition. We're off the record. The time is 1:01 p.m.

(Deposition concluded at 1:01 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Jennifer Cope, Court Reporter, Notary Public, State of Florida, certify that Noelle Henry, personally appeared before me on the 10th day of November 2026, and was duly sworn.

Signed this 20th day of November 2026.

____________________________________________

Jennifer Cope, Court Reporter
Notary Public, State of Florida
Commission No.: HH 783109
Commission Expires: March 24, 2030

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Jennifer Cope, Court Reporter, certify that I was authorized to and did report the Deposition of Noelle Henry; that a review of the transcript was waived; and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 20th day of November 2026.

Jennifer Cope

__________________________________________

Jennifer Cope, Court Reporter